1  LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C.
   David A. Markman (Nevada Bar No. 12440)
2    E-mail: dmarkman@lipsonneilson.com
   9900 Covington Cross Dr., Suite 120
3  Las Vegas, Nevada 89144
   (702) 382-1500 Telephone
4  (702) 382-1512 Facsimile

5  ZIMMERMAN REED LLP
   Caleb Marker (Pro Hac Vice Pending)
6    E-mail: caleb.marker@zimmreed.com
   2381 Rosecrans Avenue, Suite 328
7  Manhattan Beach, California 90245
   (877) 500-8780 Telephone
8  (877) 500-8781 Facsimile

9  ZIMMERMAN REED LLP
     E-mail: hart.robinovitch@zimmreed.com
10 Hart L. Robinovitch (Pro Hac Vice Pending)
   14646 N. Kierland Blvd., Suite 145
11 Scottsdale, Arizona 85254
   (480) 348-6400 Telephone
12 (480) 348-6415 Facsimile

13 *Attorneys for Plaintiff*

14                **UNITED STATES DISTRICT COURT**

15                    **DISTRICT OF NEVADA**

16 | CAMERON PARK, individually, and | Case No. |
   | on behalf of all others similarly situated, | |

17 |                                 | **CLASS ACTION COMPLAINT** |
   |          Plaintiff,             | |

18 |                                 | **(Jury Trial Demanded)** |
   | v.                              | |

19 | ZUFFA, LLC, UFC HOLDINGS LLC, | |
20 | NEULION, INC., and, DOES 1-100, | |
   | inclusive,                      | |

21 |                                 | |
22 |          Defendants.            | |

23     Cameron Park ("Plaintiff"), by and through undersigned counsel, on behalf

24 of himself and all others similarly situated, brings the following Class Action

25 Complaint against ZUFFA, LLC, UFC HOLDINGS, LLC, and NEULION, INC.

26 (collectively "Defendants"), based upon information as belief and the

27 investigation of counsel, except for information based on personal knowledge, and

28 hereby alleges as follows:

COMPLAINT                                                                    1

**PREAMBLE**

1.    The August 26, 2017 boxing match between Floyd Mayweather ("Mayweather") and Conor McGregor ("McGregor") was billed to the American public (and worldwide) as one of the biggest prize fights ever and dubbed by the media and others as "The Money Fight" and "The Biggest Fight in Combat Sports History" (hereinafter the "Fight").  The Fight was unique as, for the first time, it pitted a boxing champion (Mayweather), against an ultimate fighting/mixed martial arts champion (McGregor), adding significant intrigue and hype to the sporting event.  The Fight, ultimately won by Mayweather with a technical knockout in the 10th round, is believed to have been one of the highest grossing and most watched fights in boxing history.[1]

2.    Apart from the gate receipts, hundreds of thousands of boxing fans paid money to see the Fight on pay-per-view ("PPV") broadcasts, including those offered through Defendants' internet and media outlets and platforms, such as UFC.com, UFC.tv, and UFC's smartphone application (the "app").  PPV sales alone are believed to have exceeded $300 million for the Fight.[2]

3.    Reviews of the Fight were generally positive with commentators and fans indicating that it was an exciting sporting event, especially compared to Mayweather's previous May 2015 fight against Manny Pacquiao, which was universally criticized and panned due to general lack of excitement largely

---

[1]  Martin Rogers, *Floyd Mayweather beats Conor McGregor with 10th round TKO in 'The Money Fight'*, USA TODAY (Aug. 28, 2017, 12:56 AM), https://www.usatoday.com/story/sports/boxing/2017/08/26/floyd-mayweather-beats-conor-mcgregor-tko-money-fight/605806001/. *See also*,  Brian Mazique, *The Estimated Purses for Floyd Mayweather Vs. Conor McGregor Fight Are Staggering*, FORBES (Jun 16, 2017, 2:32 PM), https://www.forbes.com/sites/brianmazique/2017/06/16/the-estimated-purses-for-floyd-mayweather-vs-conor-mcgregor-fight-are-staggering/#3299add33d00 (estimating Mayweather to earn at least $100 million, increasing up to four times that amount if the event hits its monetary metrics, and McGregor raking in at least $30 million, though both fighters signed confidentiality agreements that restrict them from revealing the financial details publicly).
[2] Michael Blaustein, *Mayweather-McGregor was a $700 million behemoth*, N.Y. POST (Aug. 28, 2017, 12:14 PM), http://nypost.com/2017/08/28/mayweather-mcgregor-was-a-700m-behemoth/.

1   resulting from Pacquiao's undisclosed shoulder injury and inability to compete to

2   his fullest ability.[3]

3        4.      Prior to the Fight, Mayweather told the public that he owed them

4   something "to write that wrong" as a result of the lackluster Pacquaio fight.[4]

5   Mayweather and McGregor engaged in a promotional tour and other promotional

6   appearances.   Promoters and Defendants marketed the Fight heavily to fans and

7   PPV customers. All of this added to the hype and excitement the participating

8   boxers, promoters, broadcasters, and Defendants all aimed to capitalize on

9   financially.

10       5.      While the August 26, 2016 Mayweather – McGregor fight was an

11  exciting sporting event that millions of sports fans wanted to see, with significant

12  hype and pent-up demand, a major problem arose prior to the Fight.  Consumers,

13  like Plaintiff, who purchased the PPV Fight from Defendants via UFC, UFC.com,

14  UFC.tv, the UFC app, and/or other platforms operated by Defendants at the

15  required price ($99.99), were unable to actually watch the complete Fight under

16  the license purchased due to technical difficulties and insufficient bandwidth and

17  downloading problems, frustrating their PPV transactions and ability to receive

18  what they paid for.

19       6.      As reported in the aftermath of the Fight, thousands of consumers who

20  purchased the fight through UFC, UFC.com, UFC.tv, the UFC app, and/or other

---

[3] *See generally*, Mike Downey, *Mayweather vs. McGregor: Worth every penny*, CNN (Aug. 27, 2017, 12:44 PM), http://www.cnn.com/2017/08/27/opinions/mayweather-mcgregor-opinion-downey/index.html.
[4] Scott Rafferty, *Floyd Mayweather: 'I Feel Like I Owe Fans' for Disappointing Manny Pacquiao Fight*, Rolling Stone (Aug. 16, 2017), http://www.rollingstone.com/sports/news/mayweather-vs-mcgregory-owes-boxing-fans-for-pacquiao-fight-w498023.

platforms operated by Defendants were denied the ability to see the entire Fight broadcast due to widespread "outages" allegedly as a result of the high demand.[5]

7.    Upon information and belief, the broadcast outages occurred due to system overload and insufficient bandwidth and download capacity, among other technical deficiencies, whereby Defendants sold more PPV packages to consumers in the Class than they knew or should have known their broadcast/download system could realistically handle and process without experiencing widespread interference and outages.

8.    Watching a live sporting event where long, short, unannounced, or other sporadic outages occur completely ruins the viewing experience and frustrates the ability of the viewer (and his/her guests) to enjoy the PPV product purchased and experience it to the fullest and intended extent.

9.    Every aspect and reasonable interpretation of Defendants' advertisement and promotion of the PPV Fight was that if consumers paid the $99 price for the PPV they would receive and be able to view, uninterrupted, without doubt, the complete and uninterrupted Fight broadcast.  Defendants' inability to ultimately provide a complete and uninterrupted PPV broadcast of the Fight to the Class was not due to unforeseen circumstances or an act of nature, but instead from pure greed – namely, Defendants' desire to keep selling more and more and more PPV's, stretching the bandwidth and download capacity of the system to the

---

[5] Adi Joseph, *UFC.tv crashed two hours before Mayweather-McGregor, and everyone freaked out*, USA TODAY (Aug. 26, 2017, 9:51 PM), http://ftw.usatoday.com/2017/08/mayweather-vs-mcgregor-streaming-ufc-tv-ppv-pay-per-view-time-online-watch. *See also*, A.J. Perez, *Struggled to Stream the "The Money Fight"? UFC.tv customers urged to contact NeuLion*, MMA Junkie (Aug. 27, 2017), *available at:* http://mmajunkie.com/2017/08/struggled-stream-the-money-fight-ufc-customers-contact-neulion; Jon Fingas, *Demand for Mayweather-McGregor fight crashed pay-per-view servers*, Engadget (Aug. 27, 2017), *available at:* https://www.engadget.com/2017/08/27/mayweather-mcgregor-fight-crashes-ppv-servers/.

brink and beyond, irrespective of the risks they were creating for the Class of consumers.

10.     Ultimately the system overloaded and crashed from excessive sales and downloads.  Plaintiff and Class members obtained only sporadic, interrupted clips, or were unable to view the Fight at all.

11.     As a result, Plaintiff's contracts for the PPV broadcast were breached.

12.     Defendants also engaged in deceptive and misleading acts marketing and selling the PPV on UFC.tv as, *inter alia*, they knew or should have known that the PPV systems' capacity was exceeded and could not adequately handle the volume of PPV sales ultimately reached without suffering outages, compromising the PPV purchases of consumers, yet continued to sell new packages to Class members in order to maximize their revenues.

13.     Despite this, Defendants have not rectified the problem and made Plaintiff and Class members whole by refunding their PPV purchase and providing other necessary relief such as reimbursement of other amounts spent by class members in relation to the Fight, such as food, drink and other entertainment supplies.[6]

14.     Based on the foregoing, and as further alleged below, this class action lawsuit seeks damages, restitution, and other relief for persons who paid money for the PPV of the Fight through UFC's app and/or through UFC.tv. Those consumers, like Plaintiff, were denied the benefit of their bargain and as a result, damages,

---

[6] *See* A. J. Perez, *UFC, NeuLion mum on potential refunds for fans unable to stream Mayweather-McGregor fight*, MMA Junkie (Aug. 28, 2017), *available at:* http://mmajunkie.com/2017/08/ufc-neulion-floyd-mayweather-conor-mcgregor-fight-refunds ("The UFC and its streaming partner, NeuLion, have yet to address how – and even if – they will compensate customers who paid $100 for Saturday's Floyd Mayweather vs. Conor McGregor fight and were prevented from viewing it due to technical issues. The main event was delayed due to what Showtime, the fight's primary broadcaster, described as "scattered outages," but the majority of the problems appeared to be with UFC's app that runs on several different platforms and not the outages referenced by Showtime.")

restitution, and other relief is appropriate and necessary. Because of Defendants' conduct, described further within, members of the Class were injured and incurred financial loss while Defendants profited and were unjustly enriched.

## PARTIES

15.    Plaintiff Cameron Park is an individual who resides in the State of California. Plaintiff is a "person" as defined by Cal. Bus. & Prof. Code §17201.

16.    Plaintiff, like members of the Class, paid money to view the PPV broadcast Mayweather-McGregor fight held on August 26, 2017 via UFC.tv or the UFC app and suffered the loss of money, financial injury, and damage as a result of the acts and omissions of Defendants described herein.  Had Defendants not conducted the deceptive and unfair acts alleged herein, and not omitted material facts regarding system capacities, Plaintiff would not have parted with his money to watch the Fight purchased from Defendants (and/or their agents), and would not have been injured.

17.    The Class, as defined below, consists of Plaintiff and all other persons who paid money in the State of California to watch the Mayweather-McGregor fight held August 26, 2017, via UFC, UFC.com, UFC.tv, the UFC app, and/or other platforms operated by Defendants.

18.    Defendant Zuffa, LLC ("Zuffa") is an American sports promotion company specializing in mixed martial arts. It was founded in January 2001 in Las Vegas, Nevada, by Station Casinos executives Frank Fertitta III and Lorenzo Fertitta to be the parent entity of the Ultimate Fighting Championship (UFC) after they purchased it from the Semaphore Entertainment Group. The word "Zuffa" is an Italian word meaning "fight".

19.    Defendant UFC Holdings ("UFC Holdings") is the managing member of Zuffa, LLC.  UFC Holdings is a Michigan entity.  UFC Holdings is located at 2960 W. Sahara Avenue, Las Vegas, Nevada, 89102.

20.     Zuffa and UFC Holdings own and operate, directly or indirectly, UFC, the UFC.com and UFC.tv websites, and the UFC app for mobile phones and devices.     See, Terms of Use, *available at:* http://www.ufc.com/termsOfUse. Through these websites, apps, and other social media outlets and platforms, PPV packages for the Fight were sold to Plaintiff and the members of the Class.

21.     Ultimate Fighting Championship ("UFC") is owned, operated, or the alter ego of Zuffa and and/or UFC Holdings. On its website (http://www.ufc.com/discover/ufc), UFC presents itself to the public as an "organization" owned by Zuffa and further states:

> The fastest growing sports organization in the world, the Ultimate Fighting Championship® (UFC®), started in 1993 as a professional mixed martial arts (MMA) organization. UFC has revolutionized the fight business, and today stands as the world's leading MMA promoter, offering the premier series of MMA sports events that have sold out some of the biggest arenas and stadiums across the globe.

> The UFC organization follows a rich history and tradition of competitive MMA dating back to the Olympic Games in Athens. About 80 years ago, a Brazilian form of MMA known as Vale Tudo (anything goes) sparked local interest in the sport. Today, the UFC has evolved into an organization where hybrid athletes are required to know various disciplines in order to compete at an elite level in a regulated environment where safety is paramount. UFC athletes are skilled in many forms of martial arts, including karate, jiu-jitsu, boxing, kickboxing, grappling, wrestling, sumo and other combat sports.

> Owned and operated by Zuffa, LLC, headquartered in Las Vegas and with offices in London, Toronto and Singapore, UFC produces more than 40 live events annually and is the largest Pay-Per-View event provider in the world, broadcast in over 129 countries and territories, to nearly 800 million TV households worldwide, in 28 different languages. UFC content is also distributed commercially in the United States to bars and restaurants through Joe Hand Promotions, in English throughout Canada via Premium Sports Broadcasting Inc. and in French throughout Quebec via Interbox.

> In 2011, the UFC burst into the mainstream with a landmark seven-year broadcast agreement with FOX Sports Media Group. The agreement includes four live events broadcast on the FOX network annually, with additional fight cards and thousands of hours of programming broadcast on FOX properties FOX Sports 1 and FOX Sports 2. This also includes the longest-running sports reality show on television, The Ultimate Fighter®, which airs on FOX Sports 1 in the United States.

The UFC also connects with tens of millions of fans through its website, UFC.com, as well as social media sites Facebook, Instagram and Twitter. UFC President Dana White is considered one of the most accessible and followed executives in sports, with over two million followers on Twitter.

In 2014, UFC launched UFC FIGHT PASS™, a digital subscription service with exclusive live events, thousands of fights on-demand and original content. The UFC organization also licenses over 100 UFC GYM® locations

The UFC organization also licenses over 100 UFC GYM® locations, and owns UFC.TV® (offering live event broadcasts and video on-demand around the world), UFC FIT® (an in-home fitness and nutrition program), UFC Magazine, and has a videogame franchise with EA SPORTS, UFC Fight Club®, UFC Fan Expo®, UFC branded apparel, DVDs and Blu-rays and Topps Trading Cards. For more information, visit UFC.com and follow UFC at Facebook.com/UFC, Twitter and Instagram: @UFC

22.    On the same website UFC also states: "The UFC also holds the distinction as the largest live Pay-Per-View event provider in the world."

23.    On the UFC.com website is a portal for consumers to access UFC.com and purchase the PPV of the Fight. *See*, https://www.ufc.tv/events.

24.    UFC.com, UFC.tv, and the UFC app are owned, operated, and/or the alter egos of Zuffa and/or UFC Holdings.

25.    UFC, UFC.com, UFC.tv, and the UFC app are controlled by Zuffa and/or UFC Holdings.

26.    The officers, members, and/or operators of Zuffa, UFC Holdings, and UFC are common and upon information and belief include, but are not limited to "UFC President" Dana White and "Executives" Frank Fertitta and Lorenzo Fertitta.[7]

27.    Zuffa, directly or through UFC Holdings, UFC and/or other alter ego entities it controlled, contracted with NeuLion, Inc. to provide services that allow Plaintiff and members of the Class to access and view its content, including the PPV of the Fight, via UFC, UFC.com, UFC.tv, the UFC app and/or other

---

[7]    *See* http://www.ufc.com/discover/ufc/index. *See also* http://www.ufc.com/news/UFC-names-Andrew-Schleimer-Chief-Financial-Officer?id=

platforms operated by Defendants. *See*, UFC Terms of Use, *available at:* http://www.ufc.com/termsOfUse ("We have contracted with NeuLion, Inc. to provide services that provide You (the subscriber who pays a fee) with the ability to access and view our content.").

28.    Defendant NeuLion, Inc. ("NeuLion") a technology product and service provider specializing in the broadcasting, distribution, and monetization of live and on-demand digital video content to Internet-enabled devices. NeuLion is located at 1600 Old Country Road, Plainview, NY 11803. NeuLion live streamed the Mayweather vs. McGregor fight for several global rights holders worldwide, including UFC®, Sky Sports, Sky New Zealand, and Eleven Sports Network.

29.    NeuLion promoted the Fight as "The Biggest Fight in Combat Sports History" on its website. *See generally*, http://www.neulion.com/.

30.    As reported on NeuLion's website on August 23, 2017 (http://www.neulion.com/ViewArticle.dbml?DB_OEM_ID=30000&ATCLID=211662790):

> *NeuLion to Live Stream Mayweather vs. McGregor Fight for Several Global Rights Holders, Including UFC®, Sky Sports, Sky New Zealand and Eleven Sports Network*
>
> PLAINVIEW, NY -- August 23, 2017 - NeuLion, Inc. (TSX: NLN), a leading technology product and service provider specializing in the broadcasting, distribution and monetization of live and on-demand digital video content to Internet-enabled devices, today announced that it will live stream the Mayweather vs. McGregor fight for several global rights holders, worldwide, including UFC®, Sky Sports, Sky New Zealand and Eleven Sports Network. Each of these global rights holders will be using the NeuLion Digital Platform for the live streaming of the four-fight SHOWTIME PPV event, taking place Saturday, Aug. 26 at T-Mobile Arena in Las Vegas.
>
> This once-in-a-lifetime event brings together the worlds of boxing and MMA and has captured the imagination of sports fans throughout the globe from the initial announcement of the world tour and now leading up to fight night.
>
> The NeuLion Digital Platform will be handling the authentication and purchasing of the Pay-Per-View (PPV) as fans visit each of the four services, including UFC.TV, Sky Sports Box Office, Sky Fan Pass and the Eleven Sports Network's OTT service. NeuLion will also ensure that each of these services delivers the fight into each of the rights holders' respective licensed territories.

"These partners recognize the value of our depth of global experience and continued focus on delivering outstanding quality," said Roy Reichbach, President and CEO of NeuLion. "To be working with four fantastic NeuLion partners for the streaming, purchasing, and fan experience for one of the largest online events of the year, is very exciting for us."

NeuLion has also designed and developed the consumer experience that UFC, Sky Sports, Sky New Zealand and Eleven Sports Network fans will interact with as they watch the live streaming of the fight on web, mobile, tablet and other connected devices.

UFC, the world's premier mixed martial arts organization, is offering the fight to fans through UFC.TV, Sky Sports is offering the live fight as part of their Sky Box Office service, Sky New Zealand is offering the fight on Sky Fan Passand Eleven Sports Network is offering the fight through their digital service. NeuLion will be delivering and monitoring the live event from its technical operations centers located in New York and London.

About NeuLion

NeuLion, Inc. (TSX: NLN) offers solutions that power the highest quality digital experiences for live and on-demand content in up to 4K on any device. Through its end-to-end technology platform, NeuLion enables digital video management, distribution and monetization for content owners worldwide including the NFL, NBA, World Surf League, Univision Deportes, Euroleague Basketball and others. NeuLion powers the entire video ecosystem for content owners and rights holders, consumer electronic companies, and third party video integrators through its MainConcept business. NeuLion's robust consumer electronics licensing business enables its customers like Sony, LG, Samsung and others to stream secure, high-quality video seamlessly across their consumer devices. NeuLion is headquartered in Plainview, NY. For more information about NeuLion, visit www.NeuLion.com.

CONTACT INFORMATION

Press Contact: Chris Wagner | chris.wagner@neulion.com | +1 516 622 8357

Investor Relations Contact: Rob Kelly | rob.kelly@loderockadvisors.com | +1 416 992 4539

31.    Plaintiff is ignorant of the true names, capacities, relationships and extent of participation in the conduct herein alleged of the defendants sued herein as DOES 1 through 100, inclusive, but on information and belief allege that said Defendants are in some manner legally responsible for the unlawful actions, policies, and practices alleged herein, and therefore sues such defendants by such fictitious names. Plaintiff is informed and believes, and thereon allege, that each

Defendant named herein was the agent of the other, and the agent of all Defendants. Plaintiff is further informed and believes, and thereon alleges, that each Defendant was acting within the course and scope of said agency at all relevant times herein, for the benefit of themselves, each other, and the other Defendants, and that each Defendant's actions as alleged herein were authorized and ratified by the other Defendants. Once the identities of DOES 1 through 100 become known, Plaintiff will amend this complaint to describe and identify them in greater detail.

## JURISDICTION AND VENUE

32.    Jurisdiction is proper under 28 U.S.C. §1332(d)(2) because this is a class action where the parties are diverse. Plaintiff, a resident of the State of California, seeks relief on behalf of a California class, which will result in at least one Class member belonging to a different state than that of Defendants. Defendant Zuffa and UFC Holdings are residents of Las Vegas, Nevada. Defendant NeuLion is a resident of the state of New York that specifically entered the state of Nevada to broadcast and distribute the PPV of the Fight, which took place at the T-Mobile Arena, 3780 S Las Vegas Blvd., Las Vegas, Nevada 89158, to Plaintiff and the Class. In addition, the matter in controversy exceeds $5,000,000 exclusive of interest of costs. Therefore, both diversity jurisdiction and the damages threshold under the Class Action Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

33.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 for at least the following reasons: (i) Defendant Zuffa and UFC Holdings are residents of Las Vegas, Nevada; (ii) the Fight occurred within this judicial district at the T-Mobile Arena, and the PPV broadcast at issue emanated from that site; (iii) NeuLion entered the state of Nevada to participate in the broadcast and distribution of the PPV of the Fight at the T-Mobile arena to Plaintiff and the

1  Class; (iv) UFC, UFC.com, UFC.tv and the UFC app are operated in and from
2  Nevada.

3  **FACTUAL ALLEGATIONS**

4      34.    At all times relevant, Plaintiff has been an individual residing within
5  the State of California and City of Los Angeles.

6      35.    At all times relevant Defendants, and each of them, conducted
7  business nationwide, including in the States of California and Nevada, including
8  that related to PPV sales of the Fight broadcast.

9      36.    Plaintiff and other Class members paid money to watch the Fight on
10 PPV, after months of hype, promotional appearances, and advertisements by
11 Defendants.  The Fight was one of the highest priced events of any kind sold in
12 pay-per-view history.  The Fight was promoted as "The Biggest Fight in Combat
13 Sports History" and "The Money Fight."

14     37.    Three days, prior to the Fight, on August 23, 2017, Plaintiff paid $99
15 to UFC to purchase the PPV of the Fight. Plaintiff's receipt stated: "Fight
16 Pass,null,Mayweather vs McGregor,partyId:1813935,orderId:3802076".  In doing
17 so, Plaintiff entered into a contract to receive the PPV broadcast in exchange for
18 the payment made. Plaintiff fulfilled his end of the bargain, and otherwise fulfilled
19 all conditions precedent, by paying the $99 charge, as did all other Class
20 members.

21     38.    In anticipation of the Fight and in reliance on the contractual
22 promises made by Defendants, Plaintiff expended valuable time and money (on
23 food, beverages, and the like) to host his friends at his home for a private viewing
24 party.

25     39.    Defendants sought to sell a record number of PPV packages and
26 maximize revenue.  PPV sales continued through the start of the opening round.

27     40.    Upon information and belief, the fight was postponed for some time
28 in order to process still incoming PPV orders.

41.    Defendants were ill-equipped to provide the number of PPV broadcasts that were sold to all consumers who purchased them.

42.    As a result of system overloads and other technical problems, Plaintiff and many other Class members who purchased the PPV, were unable to view the entire PPV broadcast without interruption. As *USA Today* reported, "The main event was delayed due to what Showtime, the fight's primary broadcaster, described as 'scattered outages,' but the majority of the problems appeared to be with UFC's app that runs on several different platforms and not the outages referenced by Showtime."[8]

43.    "UFC Fight Pass", the digital streaming service of UFC (and also controlled and operated by Zuffa, UFC Holdings and/or UFC), sent a tweet on Twitter, on August 26, 2017 at 6:26 PM stating: "Due to overwhelming traffic you may be experiencing log in issues. This will be resolved shortly."

44.    Later at 9:08 PM on August 28, 2017, UFC Fight Pass tweeted: "Apologies for any tech difficulties logging onto http://UFC.TV. Please find an alternative provider here: http://s.sho.com/2izXNhh."

45.    Thousands of consumers who purchased the fight through UFC.com, UFC.tv, UFC's app, and/or other platforms and media outlets operated by

---

[8] A. J. Perez, *UFC 'disappointed' by technical difficulties for Mayweather-McGregor; no word on refunds*, USA TODAY (Aug. 28, 2017, 8:50 PM), https://www.usatoday.com/story/sports/boxing/2017/08/28/ufc-floyd-mayweather-conor-mcgregor-fight-technical-difficulties/610713001/. *See also*, Jon Fingas, *Demand for Mayweather-McGregor fight crashes pay-per-view servers*, Engadget (Aug. 27, 2017), *available at*: https://www.engadget.com/2017/08/27/mayweather-mcgregor-fight-crashes-ppv-servers/ ("Numerous reports have revealed that servers across the US crashed or buckled under demand for the fight, creating outages serious enough that organizers delayed the fight to make sure people could tune in. Mayweather himself said that pay-per-view servers in California and Florida crashed, while Showtime and UFC failed to load, ran into login trouble and otherwise couldn't keep up with interest."); Michael Blaustein, *Mayweather-McGregor was a $700 million behemoth*, N.Y. POST (Aug. 28, 2017, 12:14 PM), http://nypost.com/2017/08/28/mayweather-mcgregor-was-a-700m-behemoth/ ("In the end, UFC Fight Pass, the promotion's online streaming service, was so popular on fight night that its servers in California and Florida crashed.").

---

Defendants were denied the ability to see the entire Fight broadcast uninterrupted due to widespread "outages." *See* n.5, *supra*. The problem was widespread and not limited or unique to Plaintiff.

46.     Defendants' failure to deliver the complete and uninterrupted PPV broadcast to all consumers who purchased it, including Plaintiff and the Class, caused them harm, injury, damage, and out-of-pocket loss.

47.     By failure to deliver the complete and uninterrupted PPV broadcast of the Fight to all consumers who purchased it, Defendants breached contracts with Plaintiff and members of the Class.   In addition, Defendants engaged in deceptive and misleading conduct, violating various consumer protection laws including, but not limited to, the California Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1780 *et seq.*, and Unfair Competition Law ("UCL"), Cal. Bus & Prof. Code § 17200 *et seq.*

48.     Plaintiff and the Class were denied the benefit of their bargain because they did not receive the complete and uninterrupted PPV broadcast of the Fight after paying for it.

49.     Plaintiff, like other reasonable consumers in the Class who purchased the PPV, placed value on the broadcast of the Fight and expected to have an enjoyable night valued at more than the $99 PPV price, and at least no less than the $99 price.   In addition, Plaintiff, like other Class members, invested in food, drinks, and the like in order to best enjoy the evening and entertain guests who were invited to their homes.   This type of activity is both expected, reasonably foreseeable, and encouraged by Defendants when marketing the PPV of the Fight in the manner they did.

50.     Defendants knew or should have known of the restrictions and limitations on their broadcast and download capacity and not sold an excessive number of PPV packages that caused the system to crash and experience outages to the detriment of Plaintiff and the Class.

51.   By failing to disclose to consumers in the Class that excessive number of PPV packages would be sold, Defendants denied Plaintiff an important opportunity to view the Fight through alternative, more reliable means.

52.   Plaintiff and the Class, paying a premium price for the PPV (one of the highest prices ever), reasonably relied on Defendants to provide a complete and uninterrupted broadcast of the entire Fight programming via PPV. Defendants failed to do this.   Defendants knew or should have reasonably foreseen that outages would occur once of the number of PPV purchasers exceeded a certain capacity threshold that made outages certain, foreseeable, or at least significantly more likely.   Defendants' intentional or reckless disregard for this, so to maximize their profits through continued sales, was unfair and deceptive. Given the nature of a live, unique sporting event like the Fight, Defendants knew or should have known that if outages occurred due to system overloads, the PPV broadcast would be compromised, interrupted portions of the live broadcast could not be recreated or reshown for those that missed it, and Plaintiff and the Class would be injured.

53.   Sports fans, like those in the Class are deprived of value and harmed when they miss live broadcast events, learn the outcome of a sporting event without experiencing it live, learn scores, or view replays.

54.   Through their conduct, Defendants improperly and deceptively induced thousands of other consumers in the Class to purchase the Fight, and generated hundreds of millions of dollars and revenues in ill-gotten gains due to their deception such that Defendants were unjustly enriched.

55.   Given their superior and exclusive knowledge about the system capacity and shortfalls, as well as PPV sales levels, Defendants had a duty to tell consumers like Plaintiff the risks of outages presented, and at a reasonable point, to suspend further PPV sales to best protect the interests of consumers that had already made the investment. Instead, Defendants kept selling more and more

PPV packages up and through the opening bell, despite knowingly exceeding system capacity.

56.     Defendants' conduct and omissions described herein, *inter alia*: (a) breached contracts with Plaintiff and the Class; (b) constitute unlawful, unfair, and deceptive, and fraudulent conduct under California's Unfair Competition Law, Business & Professions Code §17200, *et seq.* and Consumer Legal Remedies Act.

## CLASS ALLEGATIONS

57.     Plaintiff brings this action on his own behalf and on behalf of all others similarly situated (the "Class").

58.     Plaintiff represents, and is a member of the Class, defined as follows: "All persons in the State of California that paid money to watch the Fight on pay-per-view, purchased through UFC, UFC.com, UFC.tv, the UFC app, and/or other platform operated by Defendants."

59.     Excluded from the Class are: (a) any officers, directors or employees of Defendants; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to hear this case.  Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

60.     All requisite elements for class certification under Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) are satisfied.

61.     Plaintiff does not know the exact number of persons in the Class, but given the reported PPV revenues from the Fight and California's population, believes them to be in the several thousands, making joinder of all these actions impracticable.

62.     The identity of the individual members is ascertainable through Defendants' and/or Defendants' agents' records or by public notice.

63.    There is a well-defined community of interest in the questions of law and fact involved affecting the members of the Class. The questions of law and fact common to the Class predominates over questions affecting only individual Class members, and include, but are not limited to, the following:

      a.    Whether Defendants' practices are "unfair" as defined by California Business and Professions Code § 17200;

      b.    Whether Defendants' practices are "illegal" as defined by California Business and Professions Code § 17200;

      c.    Whether Defendants' practices are "fraudulent" as defined by California Business and Professions Code § 17200;

      d.    Whether such practice violates California Business and Professions Code § 17200;

      e.    Whether Defendants breached Class members' contracts for the PPV;

      f.    Whether Defendants violated the California Legal Remedies Act, California Civil Code § 1770 *et seq.*;

      g.    Whether Defendants knew or should have known of system capacities and sold excessive PPV packages.

64.    Plaintiff will fairly and adequately protect the interest of the Class.

65.    Plaintiff has retained the undersigned counsel who are experienced in consumer class action litigation and are competent to represent the Class.

66.    Plaintiff's claims are typical of the claims of the Class which all arise from the same operative facts involving Defendants' practices.

67.    A class action is a superior method for the fair and efficient adjudication of this controversy.

68.    Classwide damages are essential to induce Defendants to comply with the laws as alleged in the Complaint.

69.    Class members are unlikely to prosecute such claims on an individual basis since the individual damages are small. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims, *e.g.*, securities fraud.

70.    Defendants have acted on grounds generally applicable to the Class thereby making appropriate final declaratory relief with respect to the Class as a whole.

71.    Members of the Class are likely to be unaware of their rights.

72.    Plaintiff contemplates providing notice to the putative Class members by direct mail in the form of a postcard, via email, and via publication.

73.    Plaintiff requests certification of a hybrid class combining the elements of Fed. R. Civ. P. 23(b)(3) for monetary damages and Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) for equitable relief.

### INTENT

74.    All acts of Defendants described within were done intentionally and purposefully with a goal towards maximizing their profits and gain at the expense of Plaintiff and the Class.

### FIRST CAUSE OF ACTION
### Breach of Contract

75.    Plaintiff incorporated by reference each allegation set forth above.

76.    Plaintiff and each Class member entered into a contract with Defendants and/or their agents.

77.    Plaintiff and each Class member paid the common price demanded (approximately $99), in exchange for a license to view the PPV of the Fight.

78.    Plaintiff and each Class member paid the demanded price in exchange for a fully operational and complete PPV broadcast of the Fight, not a partial, intermittent, delayed, or otherwise incomplete broadcast.

79.    Defendants failed to provide a complete broadcast of the Fight to Plaintiff and other members of the Class, depriving them of the benefit of their bargain.

80.    Defendants breached their contracts with Plaintiff, causing injury, harm and financial loss, as described further herein.

81.    As a result of the foregoing, damages and other appropriate relief are due to Plaintiff and the Class, including refunds of the amounts paid for the PPV.

**SECOND CAUSE OF ACTION**
**Violation of the California Legal Remedies Act**
**Cal. Civ. Code § 1750, *et seq.***

82.    Plaintiff incorporates by reference each allegation set forth above.

83.    This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Defendants' actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

84.    Plaintiff and each member of the Class are consumers as defined by California Civil Code § 1761(d).

85.    PPV packages purchased are goods and services within the meaning of Civil Code § 1761(a). Federal and state statutes classify paid cable broadcasts as a "programming service." *See, e.g.,* 47 U.S.C.A. § 522 and (6); 47 C.F.R. § 76.5 (ff); Cal. Pub. Util. Code § 5830 (c); Cal. Bus. & Prof. Code § 22770; Cal. Gov't Code § 53088.6.

86.    Defendants sold PPV packages of the Fight to Plaintiff and the Class when they knew or should have known that their broadcast systems had a finite capacity and that selling excessive packages would cause the system to crash and overload so that Class members would be periodically shut out of the broadcast and denied the ability to see the complete broadcast of the Fight.

87.    Instead of being upfront with consumers about its underpowered service, Defendants caused a likelihood of confusion and misunderstanding as to the source and quality of the HD video consumers would see on fight night. Defendants misrepresented the quality and grade of video consumers would see using its platforms and app, and knowingly failed to disclose that their system was defective with respect to the amount of bandwidth available and that Defendants' service would materially fail to conform to the quality of HD video Defendants promised.

88.    Despite the foregoing, PPV packages continued to be sold up until the opening bell, overloading the system and causing outages. In turn, Plaintiff and the Class could not view the entire Fight broadcast and were denied the benefit of their bargain.

89.    Defendants violated the CLRA in at least the following respects:

    a.    in violation of  § 1770(a)(5) and through common omissions of material fact, Defendants represented that the viewerships sold for the Fight (the PPV) had characteristics, ingredients, and benefits which they do not have;

    b.    in violation of § 1770(a)(7) and through common omissions of material fact, Defendants represented that the viewerships sold for the Fight (the PPV)  were of a particular standard, quality or grade when they were of another;

    c.    in violation of §1770(a)(9) and through common omissions of material fact, Defendants advertised the PPV viewerships for the Fight with intent not to sell them as advertised; and

    d.    in violation of §1770(a)(16) and through common omissions of material fact, Defendants represented that the PPV viewerships for the Fight were supplied in accordance with previous representations when they were not.

COMPLAINT                                                                                                                    20

90.    Defendants knew, or should have known, that its omissions of facts about system capacities and overload risks were material to reasonable consumers like those in the Class.  Had Class members been advised that the Defendants' systems risked overloading and crashing they would have taken different action, such as watching the Fight through alternative means available; not purchasing the Fight for the high price charged; or demanding in advance that Defendant limit total PPV sales to a manageable number that would not cause the system to overload.

91.    Damages on this Count alone are not sought at this time, only injunctive and declaratory relief and all other relief available at law or equity.

92.    Plaintiff has complied with Cal. Civ. Code § 1782(a) by notifying Defendants in writing, by certified mail, of the violations alleged herein and demanded that Defendants remedy those violations.  If Defendants fail to rectify or agree to rectify the problems detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to Cal. Civ. Code § 1782, Plaintiff will amend this complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA

93.    Based on the foregoing, Plaintiff and all Class members are entitled to declaratory relief, disgorgement, and restitution of Defendants' revenues associated with their conduct, or such portion of those revenues as the Court may find equitable.

### THIRD CAUSE OF ACTION
### Violation of the Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200 *et seq.*

94.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

95.    Actions for relief under the Unfair Competition Law, Bus & Prof. Code §17200 *et seq.* ("UCL") may be based on any business act or practice that

falls within the broad definition of the UCL.  Such violations of the UCL occur as a result of unlawful, unfair or fraudulent business acts and practices.

96.     The UCL prohibits any "unfair...business act or practice."

97.     In order to satisfy the "unfair" prong of the UCL, a consumer must show that the injury: (1) is substantial; (2) is not outweighed by any countervailing benefits to consumers or competition; and, (3) is not one that consumers themselves could reasonably have avoided.

98.     Defendants' acts, omissions, misrepresentations, and practices as alleged herein constitute "unfair" business acts and practices within the meaning of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein.

99.     Here, Defendants' conduct has caused injury to Plaintiff and members of the Class.  Plaintiff and members of the Class have suffered injury in fact due to Defendants' unilateral decision to suppress and withhold highly material information about their PPV broadcast capacity so as to induce consumers to purchase the Fight. Thus, Defendants' conduct has caused substantial injury to Plaintiff and members of the Class.

100. Moreover, Defendants' conduct as alleged herein solely benefits Defendants while providing no benefit of any kind to any consumer. Such deception utilized by Defendants convinced Plaintiff and members of the Class that the money paid for the PPV of the Fight was reasonable fair market value, when in fact Defendants knew that they were selling an inferior product. Thus, the injury suffered by Plaintiff and the members of the Class is not outweighed by any countervailing benefits to consumers.

101.   Finally, the injury suffered by Plaintiff and members of the Class is not an injury that these consumers could reasonably have avoided. After Defendants falsely represented, withheld, and suppressed information pertaining to the Fight and limited broadcast/download capacity, Defendants continued to encourage consumers to purchase the Fight for the high PPV price charged. These consumers suffered injury in fact due to Defendants' charging of high rates, for such an inferior product, which was rendered inferior by Defendants' own material omissions. As such, Defendants took advantage of their position of perceived power and exclusive knowledge in order to deceive Plaintiff and the Class members to purchase the PPV of the Fight in such high quantities. Therefore, the injury suffered by Plaintiff and members of the Class is not an injury which these consumers could reasonably have avoided.  Plaintiff reserves the right to allege further conduct which constitutes other unfair business acts or practices. Such conduct is ongoing and continues to this date.

102.   Based on the foregoing, Defendant's conduct has violated the "unfair" prong of California Business & Professions Code § 17200.

103.   California Business & Professions Code § 17200 also prohibits any "fraudulent...business act or practice."

104.   In order to prevail under the "fraudulent" prong of the UCL, a consumer must allege that the fraudulent business practice was likely to deceive members of the public. The test for "fraud" as contemplated by the UCL is whether the public is likely to be deceived. Unlike common law fraud, a § 17200 violation can be established even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.

105.   Here, not only were Plaintiff and the Class members likely to be deceived, but these consumers were actually deceived by Defendants. Such deception is evidenced by the fact that Defendants failed to disclose their PPV broadcast/download capacity limitations, a fact that would have been material to

any reasonably minded consumer, including Plaintiff, in their determination of whether to purchase the PPV of the Fight on Defendants' platforms, and at what price. Plaintiff's reliance upon Defendants' deceptive omissions is reasonable due to the unequal bargaining powers and knowledge of Defendants and Plaintiff.  For the same reason, it is likely that Defendants' fraudulent business practice would deceive other members of the public.

106.  Based on the foregoing, Defendants' conduct has violated the "fraudulent" prong of California Business & Professions Code § 17200.

107.  California Business and Professions Code § 17200, *et seq.* also prohibits "any unlawful...business act or practice."

108.  As explained above and below with respect to the CLRA claim, Defendants deceived Plaintiff and other Class members by actively concealing the PPV broadcast/download capacity limitations, which caused the system to overload and crash, and rendered the complete PPV broadcast inaccessible to Plaintiff and the Class.

109.  These omissions by Defendants are therefore an "unlawful" business practice or act under Business and Professions Code §17200, *et seq.*

110.  Defendants' systematic and widespread breach of contract is also an unlawful business practice.

111.  Every aspect and reasonable interpretation of Defendants' advertisement and promotion of the PPV of the Fight was that if consumers paid the $99 price for the PPV they would receive and be able to view, uninterrupted, without doubt, the complete Fight broadcast.  Defendants' inability to ultimately provide the Class a complete and uninterrupted PPV broadcast of the Fight was not due to unforeseen circumstances or an act of nature, but instead from greed – namely, Defendants' desire to keep selling more and more and more PPV's, stretching the download capacity of the system to the brink and beyond, pushing

revenue to record levels, irrespective of the risks they were creating insofar as being unable to deliver what they sold to the Class.

112.    Defendants used false advertising, marketing, and misrepresentations to induce Plaintiff and Class members to purchase the PPV broadcast of the Fight. Had Defendants not falsely advertised, marketed, or misrepresented the ability to deliver the PPV broadcast of the Fight, Plaintiff and Class members would not have purchased the Fight on Defendants' platforms. Defendants' conduct, therefore, caused and continues to cause economic harm to Plaintiff and Class members.

### FOURTH CAUSE OF ACTION
#### Money Had and Received

113.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

114.    Through the above described acts and conduct, Defendants received money, directly or indirectly, from Plaintiff and the Class which in equity and good conscious they cannot and should not retain.

115.    Through the above described acts and conduct, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

116.    Defendants' continued retention of these sums is unjust.

117.    Based on the foregoing, Defendants should be required to disgorge all such profits, and provide restitution and/or damages as may be available at law or equity.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class members pray for judgment as follows:

A.    Certifying the Class as requested herein pursuant to Fed. R. Civ. P. 23(a), 23(b)(9), 23(b)(2), and 23(b)(3), appointing Plaintiff as the Class representative and the undersigned counsel as Class counsel;

B.  Restitution of the funds obtained by Defendants from the Class, directly or indirectly;

C.  Disgorgement of the funds obtained by Defendants from the Class, directly or indirectly;

D.  Any and all damages on the breach of contract claim and any other claim where such relief is permitted by law;

E.  All reasonable and necessary attorneys' fees and costs provided by statute, common law, equity, or the Court's inherent power;

F.  For equitable and declaratory relief; and,

G.  Any and all other relief that this Court deems just and proper at law or equity.

Respectfully submitted,

LIPSON, NEILSON, COLE, SELTZER & GARIN, P.C.

Dated: August 29, 2017          /s/ David A. Markman
David A. Markman (Nevada Bar No. 12440)
  E-mail: dmarkman@lipsonneilson.com
9900 Covington Cross Dr., Suite 120
Las Vegas, Nevada 89144
(702) 382-1500 Telephone
(702) 382-1512 Facsimile

Caleb Marker (Pro Hac Vice Pending)
ZIMMERMAN REED LLP
  E-mail: caleb.marker@zimmreed.com
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, California 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

Hart L. Robinovitch (Pro Hac Vice Pending)
ZIMMERMAN REED LLP
  E-mail: hart.robinovitch@zimmreed.com
14646 N. Kierland Blvd., Suite 145
Scottsdale, Arizona 85254
(480) 348-6400 Telephone
(480) 348-6415 Facsimile

*Attorneys for Plaintiff*